**GREEN EVANS-SCHROEDER, PLLC**
Matthew H. Green (Bar No. 020827)
Peter Hormel (Bar No. 015808)
130 West Cushing Street
Tel.: (520) 882-8852
Fax: (520) 882-8843
Email: matt@arizonaimmigration.net
*Attorneys for Defendant*

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>Plaintiff,<br><br>vs.<br><br><br>Hernan Rafael Castro,<br><br>Defendant. | CR25-02525-RCC-MSA-1<br><br>**MOTION TO DISMISS INDICTMENT**<br><br>.<br><br><br><br>(Honorable Raner C. Collins) |

Defendant moves to dismiss the Indictment for a violation of his Fifth Amendment right to present a complete defense by the bad faith destruction of, and failure to preserve, potentially exculpatory evidence. *Arizona v. Youngblood*, 488 U.S. 51 (1988). He alternatively requests an adverse inference instruction, which requires no bad faith. *United States v. Sivilla*, 714 F.3d 1168, 1173 (9th Cir. 2013); 9th Cir. Crim Jury Instr 4.19. He alternatively requests "any other order that is just under the circumstances" to remedy a violation of Rule 16(a)(1)(E)(i). Fed. R. Crim. P. 16(d)(2). The lost evidence is: **video and/or audio recording of Mr. Castro's naturalization interviews at the U.S.**

**Citizenship and Immigration Services (USCIS) Tucson Field Office (1) on October 28, 2014, with Immigration Services Officer Robin Bayer, and (2) on May 17, 2023, with Immigration Services Officer Livia Lopez.**

## I.      Background Information

Defendant is a 38-year-old Mexican Citizen. He holds the status of Lawful Permanent Resident. On May 28, 2025, he was indicted[1] on one count of making a false certification in violation of 18 U.S.C. § 1015(d), alleging that he had answered "no" in response to the following question on his N-400 Application for Naturalization: "have you ever sold or smuggled controlled substances, illegal drugs or narcotics?"

Following the receipt of initial disclosure in this case, the defense on June 22, 2025 made a written request for disclosure of the above-referenced recorded evidence. **Exhibit D**, Letter of Matthew Green to AUSAs Sottosanti and Solis, p.2. In the letter, the defense further requested that all requested recorded materials be preserved, and that the relevant agents be advised of the request. **Exhibit D**, pp. 2-3.

## II.     Charges and Evidence Against Mr. Castro

The defendant, Hernan Castro, is charged in the indictment with a single count of False Certification, 18 U.S.C. § 1015(d). *See* Indictment, Doc. 1.  Mr. Castro immigrated to the United States and became a Lawful Permanent Resident (LPR) when he was twelve years old. *See* Pretrial Services Report, Doc. 9, p. 2.  Between the time Mr. Castro was

---

[1] For a summary of the investigation that led to the indictment, see attached **Exhibit A**, Governments Disclosure Bates Nos. 0105-115, ROI.

eighteen and twenty-two years old, Mr. Castro was convicted of two drug-related felonies in Pima County Superior Court No. CR20062536, and two shoplifting misdemeanor convictions in Tucson City Court Nos. CR9080694 and CR9131000.

In 2014, Mr. Castro filed his first application for naturalization with U.S. Citizenship and Immigration Services (USCIS).  The Government's disclosure of that application indicates that Mr. Castro checked a box labeled "Yes" that corresponded to Question 30(C), "Have you ever . . . [s]old or smuggled controlled substances, illegal drugs, or narcotics?"  The Government's disclosure also indicates that Mr. Castro made a sworn statement to a USCIS Immigration Services Officer (ISO) at the time of his interview in 2014 that he had sold Klonopin (Clonazepam) when he was a minor, in high school.  Mr. Castro also disclosed his Tucson City Court misdemeanor convictions during that interview and, as a result, his naturalization application was denied. He was subsequently taken into custody by Immigration and Customs Enforcement (ICE) on March 30, 2015, and placed in removal proceedings with the Eloy Immigration Court. The Notice to Appear (NTA) in that case charged Mr. Castro as being removable for having been convicted of two or more crimes involving moral turpitude (CIMTs) at any time after admission as an LPR, and the two CIMTs that were specifically alleged were Mr. Castro's Tucson City Court shoplifting convictions, *supra*.  Notably, ICE did not make any allegations, or bring any charges, or removability which were related to any arrests or convictions of drug-related offenses.

While in ICE detention, a Tucson attorney, Margo Cowan, entered her appearance in the Eloy Immigration Court and continued to represent Mr. Castro until his removal

proceedings were dismissed after he successfully vacated his two Tucson City Court misdemeanor convictions.  The disclosure also demonstrates that Ms. Cowan, who is now suspended from the practice of law, continued to represent Mr. Castro in his immigration matters at least through 2016, when she assisted Mr. Castro with applying to renew his green card, and with an appeal of the denial of that subsequent application.

On or about May 30, 2022, the disclosure also reveals that Mr. Castro filed a new USCIS N-400 application for naturalization.  As alleged in the indictment, on that application, Mr. Castro checked a box labeled "No" that corresponded to Question 30(C), "Have you ever . . . [s]old or smuggled controlled substances, illegal drugs, or narcotics?"

Mr. Castro thereafter appeared for an interview with USCIS on his second naturalization application on May 17, 2023.  USCIS Immigration Services Officer (ISO) Livia Lopez conducted the interview.  Unlike her predecessor in 2014, Ms. Lopez did not elicit a detailed sworn statement from Mr. Castro about his criminal history, and she did not specifically confront him with the fact that he had previously provided a different answer to the same question on his Form N-400 application. *See* **Exhibit B**, Government's Disclosure, Bates Nos. 0016-0017, Record of Sworn Statement, May 17, 2023.

Therefore, defense counsel specifically requested that the Government disclose the recording of Mr. Castro's naturalization interview on May 17, 2023 as described above. The Government initially reported back that no recording was made of the interview. When undersigned counsel explained to the Government that it was standard procedure to make such a recording, and to preserve it under the circumstances of this case, the Government checked with USCIS again, and on July 28, 2025, provided a supplemental

report of investigation (ROI) from the case agent, Homeland Security Investigations (HSI)

Special Agent Randall Dillman, which states:

> ISO Lopez was asked if there were any audio or video recordings of the CASTRO-Gonzalez interview and they stated that interview was recorded however there were problems with their computer and that it was unlikely it was saved however they were not sure.
>
> ISO Lopez stated that if a recording did exist it might be somewhere in possibly a USCIS cloud-based storage system after their computer had been re-imaged and they had received another or that it could be in the USCIS Electronic Immigration System (ELIS) system.
>
> ISO Lopez stated that they had two (2) subsequent computers since the time of the CASTRO-Gonzalez interview and that the interview recording has most likely been lost.
>
> ISO Lopez stated that recorded interviews were not usually retained if the N-400 application resulted in naturalization being approved and that the retention time in that case was approximately a week.  ISO Lopez stated that usually in cases where there was a denial the interview would be burned to a disc and placed in the A-file.

**Exhibit C,** Government Disclosure, Bates Nos. 0314-0318, ROI of Randall Dillman,

pp. 3-4. (Emphasis added).

In that same ROI, Special Agent Dillman explained that the interview of Ms.

Lopez, which took place on July 16, 2025, lasted for over an hour.  During that interview,

Ms. Lopez told "members of the USAO's Office, Assistant Chief Council [sic] (ACC) for

Immigration and Customs Enforcement (ICE) Office of the Principal Legal Advisor

(OPLA) and additional members of USCIS, Tucson, Arizona Office" that she

"remembered CASTRO-Gonzalez, and his application, due to the extensive amount of

criminal history that was contained in it." *Id.*, p. 3. Ms. Lopez also stated that "there was

outside reporting that CASTRO-Gonzalez had possibly harbored members of his family

that were present illegally in the United States at his residence during the interview." *Id.* SA Dillman thereafter writes that "ISO Lopez questioned CASTRO-Gonzalez during his interview about this information." *Id.* Although Ms. Lopez could not remember how long her interview with Mr. Castro lasted, in her opinion "it would have been longer due to having to administer a sworn statement," and "[u]ltimately, ISO Lopez estimated that the interview took approximately forty-five (45) minutes to complete." *Id.* at p. 4.

Significantly, Ms. Lopez states during her July 16, 2025, interview with HSI that she "did not recall having access to, or seeing/reviewing, CASTRO-Gonzalez' 2014, Form N-400, Application for Naturalization before conducting his 2022 interview." *Id.* at p. 3. On the other hand, Ms. Lopez admits that she thought that Mr. Castro "had been in removal proceedings at one point however they had been terminated." *Id.*

### III.    Materiality of the Recordings to Mr. Castro's Defense

Mr. Castro is charged under an obscure criminal statute, 18 U.S.C. § 1015(d). Having researched the statute, it appears that the Seventh Circuit Court of Appeals is the only jurisdiction to have ever published a pattern jury instruction for this particular subsection. *See* The William J. Bauer Pattern Jury Instructions of the Seventh Circuit (2023 Ed.), p. 458.[2]  The subsection's language clearly requires the Government to prove that the defendant *knowingly* made a false certification and *knew* that the certification was required as charged in the indictment. In other words, there are two elements to the crime, each of which require the Government to prove a mens rea of knowingly.  Therefore,

---

[2] https://www.ca7.uscourts.gov/assets/pdf/Criminal_Jury_Instructions.pdf

evidence that sheds light on Mr. Castro's mental state at the time he completed and filed

his naturalization application in 2022, and as it existed during his naturalization interview

in 2023, is highly relevant to the question of his guilt.

In this case, the evidence clearly shows that, in 2014, Mr. Castro attended a lengthy

naturalization interview where he was confronted with his criminal history, especially his

drug use.  At that interview, he was questioned and, in a sworn statement, he admitted that

he sold a prescription drug in high school.  As a result of that interview, and the answers

he provided, his naturalization application was denied.  But that was not the worst

consequence, since he then spent nearly half a year in the Eloy Detention Center fighting

against deportation.

In other words, the obvious question for the jury is, if Mr. Castro knew that two of

the three components of the Department of Homeland Security (ICE and USCIS) had

extensive records of his immigration history, why on Earth would he "knowingly" lie on

his second naturalization application in 2022, or during his naturalization interview with

Ms. Lopez in 2023?  In this case, the defense intends to argue that there are several reasons

to doubt that Mr. Castro knowingly made a false certification on his naturalization

application. The following two sections demonstrate why the recordings of the two

interviews are critical to his defense.

### 1. Advice of Counsel Defense

First, based on confidential information obtained from his client, undersigned

counsel has reason to believe that Mr. Castro's answers on his 2022 naturalization

application, and during his 2023 naturalization interview, were provided as a result of

legal advice by his former immigration attorney, Margo Cowan[3], and/or from that of non-lawyer personnel, under her supervision, engaging in the unauthorized practice of law. A good faith reliance on the advice of counsel will provide a complete defense where the government has to prove that the defendant violated a known legal duty. *See United States v. Mathes*, 151 F.3d 251, 255 (5th Cir. 1998); *United States v. Blagojevich*, 794 F.3d 729, 738-39 (7th Cir. 2015).  The advice of counsel defense can extend to reliance on advice from non-attorneys as well. *See United States v. Ford*, 184 F.3d 566, 579-80 (6th Cir. 1999).

Given the difference between Mr. Castro's responses in 2014 and his responses in 2023, the recordings of Mr. Castro's interview would likely have shed light on this issue.

### 2.  Issues Related to Mr. Castro's 2023 Naturalization Interview

Ms. Lopez, the Immigration Services Officer (ISO) who conducted the interview, is a material witness for the Government (and the defense). Based on confidential information obtained from his client, undersigned counsel has reason to believe that Ms. Lopez' interview was inappropriately aggressive and coercive. Long-established USCIS

---

[3] Ms. Cowan was recently suspended from the practice of law for, among other things, nearly identical reasons. *See* **Exhibit E**, Suspension Order, Presiding Disciplinary Judge for the Supreme Court of Arizona, No. PDJ 2024-9041, Feb. 7, 2025

sub-regulatory guidance to ISOs makes it abundantly clear that a naturalization interview is, above all else, meant to be "non-adversarial."[4]

There is ample reason to doubt that Mr. Castro's 2023 interview was anything but "non-adversarial."

As set forth *supra*, in the Government's most recent disclosure, Ms. Lopez stated that, in her opinion, the interview with Mr. Castro lasted longer than normal. She was aware of his "extensive criminal history," and somehow made aware of "outside reporting" that Mr. Castro was allegedly involved with alien harboring. *See* Exh. C, HSI ROI TU16C425TU0001-005, 07/21/2025, p. 3.[5]  Ms. Lopez explains that, for this reason, she "questioned CASTRO-Gonzalez during his interview about this information." *Id.* The form of the sworn statement that Ms. Lopez administered to Mr. Castro is, upon counsel's information and belief (and professional familiarity with the administration and preparation of such sworn statements) highly unusual, and probably improper under relevant USCIS guidance.   The Government's disclosure of the sworn statement administered to Mr. Castro in 2014 is, for example, illustrative of what a proper sworn statement should look like. **Exhibit F**, Government's Disclosure, Bates Nos. 0055-0056, Record of Sworn Statement, October 28, 2014. In that first sworn statement, administered

---

[4] *See, e.g., generally,*
https://www.uscis.gov/sites/default/files/document/foia/Interviewing_-_Intro_to_the_NonAdversarial_Interview_LP_RAIO.pdf.

[5] Upon information and belief, Mr. Castro has never been arrested for alien smuggling or harboring, nor has he been questioned about such allegations by anyone other than Ms. Lopez during his second naturalization interview in 2023.

by now-retired ISO Robin Bayer, Mr. Castro is cleanly asked a series of direct questions, to which he provides a series of answers.

In sharp contrast, Ms. Lopez, who was clearly concerned about criminal wrongdoing by Mr. Castro, asks Mr. Castro a single, direct question: "Have you ever helped any person to enter illegal [sic] to the United States." Exh. B, pp. 0016-0017.  After Mr. Castro answers, "no," she proceeds to ask another not-so-direct question: "Have you ever committed, assisted in committing, or attempted to commit, a crime or offense for which you were not arrested??" [Sic.]  After Mr. Castro again answers, "no," instead of offering him the benefit of being informed of any specific concerns she has about his criminal history, Ms. Lopez simply asks Mr. Castro, "[i]s there something else you want to add?" *Id.*  Under the circumstances, there is serious concern that Ms. Lopez, under the direction or influence of federal law enforcement officials, was attempting to trap Mr. Castro into making either an incriminating statement, or as the government now essentially alleges, an incriminating omission.

It is self-evident that a recording would resolve these questions.

IV.     **Failure to Preserve and Disclose the Recording**

According to Ms. Lopez, "recorded interviews were not usually retained if the N-400 application resulted in naturalization being approved and that the retention time in that case was approximately a week," but "that usually in cases where there was a denial the interview would be burned to a disc and placed in the A-file." **Exhibit C**, Government Disclosure Bates Nos. 0314-0318, ROI of Randall Dillman, p. 4. Upon information and belief, this is not an entirely accurate statement of the USCIS Tucson Field Office policy,

and undersigned counsel has reason to believe that the policy is to burn the interview to a disc in cases where the application *is likely to result in denial*.

Ms. Lopez' credibility is also at issue. As set forth in her recent interview with the Assistant U.S. Attorney (AUSA) and his case agent, Ms. Lopez claims that she did not recall having access to or seeing anything related to Mr. Castro's 2014 naturalization application or naturalization interview. *Id.* at p. 3. Based on preliminary conversations with a former USCIS Tucson Field Office ISO, who will likely be noticed as an expert witness in this case, the veracity of Ms. Lopez' statement is highly doubtful. Indeed, even undersigned counsel, while reviewing the defendant's alien registration file, or "A file," with the AUSA and his case agent on July 18, 2025, was able to observe all the relevant documents associated with Mr. Castro's various immigration applications and interviews over the past twenty-five years. Therefore, it is unlikely in the extreme that Ms. Lopez did not have access to this documentation during the interview. As such, destruction of the recording serves a clear purpose for the government and raises the question of bad faith.

V.    **LAW**

**A. Introduction**

Due process. The Fifth Amendment requires the government to preserve evidence "that might be expected to play a significant role in the suspect's defense." *See California v. Trombetta*, 467 U.S. 479, 488 (1984). The government violates a defendant's right to due process when it destroys or fails to preserve evidence that possessed "exculpatory value that was apparent before the evidence was destroyed,

and [is] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.* at 489. For lost evidence that is not exculpatory but is "potentially useful" to the defense, *Youngblood*, 488 U.S. at 57-58, "[t]he government violates a defendant's due process rights when it destroys potentially exculpatory evidence in bad faith," *United States v. Ubaldo*, 859 F.3d 690, 703 (9th Cir. 2017); *accord Zaragoza-Moreira*, 780 F.3d at 977-82; *United States v. Cooper*, 983 F.2d 928, 931 (9th Cir. 1993). The presence of bad faith turns on the government's knowledge of the apparent exculpatory value of the evidence at the time it was lost. *Youngblood*, 488 U.S. at 56-57; *Zaragoza-Moreira*, 780 F.3d at 979-80 (item's value as potentially exculpatory evidence was repeatedly suggested to agents). Other factors include a departure from normal procedures or other acts to gain an unfair advantage at trial. *United States v. Medina-Villa*, 567 F.3d 507, 518 (9th Cir. 2009).

Remedial jury instruction. Even absent bad faith, an adverse inference jury instruction is appropriate to remedy the negligent loss of evidence in government custody when the balance between the quality of the government's conduct and the degree of prejudice to the defendant weighs in favor of the defendant. *Sivilla*, 714 F.3d at 1173.

Fed. R. Crim. P. 16. "[W]hen the government fails to comply with preservation requests and allows evidence to be destroyed, it likely runs afoul of … [Rule] 16." *Zaragoza-Moreira*, 780 F.3d at 981. When a party violates Rule 16, the Court may "enter any other order that is just under the circumstances." Fed. R. Crim. P. 16(d)(2).

1

### B. Dismissal is warranted

2

The failure to preserve the video and the audio from his interview violated

3

Defendant's right to due process. The Ninth Circuit's reasoning in *Zaragoza-Moreira*,

4

780 F.3d at 981, is dispositive. There the defendant was a drug body carrier at a port

5

of entry. *Id.* at 974. She claimed duress and repeatedly told the agent that, while waiting

6

in the port's pedestrian lane for almost an hour, she made gestures to make herself

7

"obvious" because she "wanted to be known" and be caught, and that the organizer's

8

presence with her in the line prevented her from surrendering sooner. *Id.* at 975-76,

9

979. Five days after she was charged, her lawyer asked the prosecutor to preserve "all

10

11

videotapes ... that may be destroyed." *Id.* at 976. Two months later, the government

12

advised that the video of the pedestrian lane had been automatically overwritten 30 to

13

45 days after the arrest. *Id.* at 977.

14

The *Zaragoza-Moreira* court held that the agent's failure to preserve the video

15

violated the defendant's due process right to present a complete defense. *Id.* at 977.

16

17

The video was potentially useful to the defense because the defendant had to prove that

18

she took the earliest reasonable opportunity to escape by submitting to authorities. *Id.*

19

at 978. It may have shown that she threw her passport on the ground, tried to loosen

20

the drugs strapped to her, was removed from the line by the supposed organizer due to

21

her behavior, and was in fact trying to make herself obvious. *Id.* It may also have shown

22

that the organizer was with and controlling her and, thus, whether she could not have

23

24

alerted inspectors earlier. *Id.* Further, its potentially exculpatory evidence value was

25

readily apparent to the agent because that value was repeatedly suggested during the

post-arrest interview. *Id.* at 978-79. It made no difference that the agent claimed to have merely "overlooked" the need to retrieve it because she understood the defendant's claims of trying to be caught and had even asked why the defendant had not alerted agents earlier, prompting the defendant to explain again that the organizer was with her in line. *Id.* at 979. It also made no difference that the defendant made other statements that arguably weakened her defense; "the strength of her defense … do[es] not diminish the potential usefulness of the video." *Id.* at 979-80.

The *Zaragoza-Moreira* court further held that the agent acted in bad faith. *Id.* at 980. The agent knew that the pedestrian lane was under constant video surveillance and that she had the ability to review and preserve the recordings. *Id.* Her probable cause statement in the complaint also omitted any mention of the duress claim and, as another reason "to at least view the video evidence to determine if [the defendant's] statements could be corroborated or disproved," the Court found it significant that the agent, through post-arrest investigation, verified the defendant's related statement upon arrest that she had crossed the border into Mexico on a certain date with the same person whom she claimed was in the line on the date of the arrest. *Id.* Although the agent was not aware of the defense lawyer's preservation request made within the video's retention period because the prosecutor failed to relay it to the agent, the Court signaled that bad faith would have been even easier to find if the agent had known of, and disregarded, a preservation request. *See id.* at 980-81 ("[T]he government's failure to take action in response to [the preservation request] is particularly disturbing."). The

Court rejected an argument that ongoing plea negotiations justified the prosecutor's failure to notify the agent of the request. *Id.*

The *Zaragoza-Moreira* court finally held that the defendant's own testimony concerning duress, as well as her cross-examination of port officers who had not seen her in line, was not reasonably available comparable evidence. *Id.* at 981-82 ("[defendant's] self-serving testimony … would not be comparable to video footage that recorded her actions"). It remanded "with directions to dismiss the indictment." *Id.* at 982.

During his 2014 naturalization application, Mr. Castro had voluntarily disclosed the information about his high school kolonopin sale to the government, both in writing and during his interview. In 2023, he therefore had every reason to believe that the government already knew about it and no reason to believe that he had any power to keep this information from the government. Without the recording of his interview, it is impossible to show how he actually responded to the relevant questions, or how those questions were framed—or even which potentially important questions were omitted. Mr. Castro is, as a result, now unable to present a complete defense.

## C. Alternatively, an adverse inference instruction is warranted

An adverse inference jury instruction is appropriate to remedy a negligent loss of evidence in government custody when the balance between the quality of the government's conduct and the degree of prejudice to the accused weighs in favor of the defendant. *Sivilla*, 714 F.3d at 1173; 9th Cir. Crim Jury Instr 4.19, https://www.ce9.uscourts.gov/jury-instructions/node/674. The government bears the

burden of justifying its conduct, and the defendant bears the burden of demonstrating prejudice. *Sivilla*, 714 F.3d at 1173. A showing of bad faith is not required. *Id*. at 1170. In evaluating the government's conduct, factors include whether the evidence was destroyed while in the government's custody, whether it acted in disregard of the defendant's interests, whether it was negligent, whether the prosecuting attorneys were involved, and, if the acts were deliberate, whether they were taken in good faith or with reasonable justification. *Id*. The *Sivilla* court held that these factors weighed in the defendant's favor where, as here, following a defense preservation request, the government "was negligent in failing to adhere to reasonable standards of care in its prosecutorial functions," and "[i]n total, the quality of the government's conduct was poor." *Id.*

In evaluating prejudice, factors include the centrality and importance of the evidence to the case, the probative value and reliability of secondary or substitute evidence, the nature and probable weight of the factual inferences and kinds of proof lost to the accused, and the probable effect on the jury from the absence of the evidence. *Id*. at 1173-74. The *Sivilla* court held that these factors weighed in the defendant's favor where "grainy and indecipherable photographs" were not an adequate substitute from which the defense could rebut the prosecution's argument that the defendant must have known about the dugs inside the engine's manifold, which took the agent and a mechanic two hours to remove, by showing that the drugs could have been installed and removed quickly on a public street without a mechanic. *Id.* at 1170, 1174 (the defense "would have needed access to the vehicle itself"). Similarly here, as discussed

1    in Section V(B) above, each factor weighs in favor of giving the remedial instruction

2    as to each of the items of lost evidence at issue.

3    **D.  Alternatively, a remedy is warranted for the discovery violation**

4         "[W]hen the government fails to comply with preservation requests and allows

5    evidence to be destroyed, it likely runs afoul of … [Rule] 16." *Zaragoza-Moreira*, 780

6    F.3d at 981 (not reaching the issue where a bad faith failure to reserve violated the

7    Constitution). Rule 16(a)(1)(E)(i)'s requirement—to disclose for good cause objects

8    within the government's possession, custody or control that are material to preparing

9    the defense—"is unconditional." *United States v. Hernandez-Meza*, 720 F.3d 760, 768

10   (9th Cir. 2013).

11        Defendant's request for preservation of the recorded interview fell within the

12   ambit of Rule 16(a)(1)(E)(i) and established the required showing of materiality. *See*

13   *United States v. Doe*, 705 F.3d 1134, 1151 (9th Cir. 2013) (holding that the rule

14   includes information that would help to establish the defendant's credibility); *United*

15   *States v. Mandel*, 914 F.2d 1215, 1219 (9th Cir. 1990) (holding that the rule includes

16   information "relevant to the development of a possible defense"). The video was

17   "within the government's possession, custody, or control" under Rule 16 because it

18   was either possessed by a federal agency participating in the same investigation, *United*

19   *States v. Bryan*, 868 F.2d 1032, 1036 (9th Cir. 1989), or by another executive branch

20   agency and the prosecutor had knowledge of and access to it, *United States v. Santiago*,

21   46 F.3d 885, 893-94 (9th Cir. 1995). The government's failure to preserve and disclose

22   the video is a discovery violation.

17

A discovery sanction is appropriate. If a party fails to disclose evidence in compliance with Rule 16, the court may enter any order "that is just under the circumstances." Fed. R. Crim. P. 16(d)(2)(D). Factors include "the reasons why disclosure was not made, the extent of the prejudice, if any, to the opposing party, the feasibility of rectifying that prejudice by a continuance, and any other relevant circumstances." Fed. R. Crim. P. 16, Advisory Comm. Note on 1966 Amendment; see also *United States v. de Leon*, 627 F. Supp. 3d 682, 703 (W.D. Tex. 2022) (Cardone, J.) (holding that exclusion of the defendant's confession was least harsh means of ensuring that defendant was not prejudiced by agent's bad-faith destruction of video).

## VI.   CONCLUSION

Because no other remedy is adequate, the Court should dismiss the Indictment. Alternatively, it should give a remedial adverse inference jury instruction. Alternatively, it should enter any other appropriate order to remedy the discovery violation.

RESPECTFULLY SUBMITTED this 29th day of August, 2025.

By: s/ *Matthew H. Green*
Matthew H. Green
Attorney for Defendant

Copy of the foregoing
via CM/ECF to:

Vincent J. Sottosanti, Esq.
Assistant United States Attorney

Jose R. Solis, Esq.
Assistant United States Attorney