WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| United States of America, | No. CR-25-02525-001-TUC-RCC (MSA) |
|---|---|
| Plaintiff, | **REPORT AND RECOMMENDATION** |
| v. | |
| Hernan Rafael Castro, | |
| Defendant. | |

Hernan Castro, a native and citizen of Mexico and lawful permanent resident of the United States, is charged with knowingly making a false certification in an application for naturalization. Castro claims that the Government violated due process when it failed to preserve evidence that may have been helpful to his defense. He thus moves for an order dismissing the indictment or, in the alternative, granting him a lesser remedy. The Court will recommend that his motion be denied.

**Background**

This case arises from a discrepancy between two applications for naturalization filed by Castro with United States Citizenship and Immigration Services (USCIS). Castro filed his first, uncounseled application in 2014. (Ex. 53.) As relevant here, he checked a box indicating "Yes" to Question 30(C): "Have you ever . . . [s]old or smuggled controlled substances, illegal drugs, or narcotics?" (*Id.* at 513.)[1] An Immigration Services Officer (ISO) interviewed Castro in connection with his application later that year. (Ex. 16.) There,

---

[1] Exhibit citations are to the Bates numbering at the bottom center of each exhibit.

1  Castro stated under oath that he had sold Klonopin while in high school. (*Id.* at 1–2.) He
2  also stated that he had been arrested several times for shoplifting. (*Id.* at 2.) A few months
3  after the interview, USCIS denied Castro's application on the ground that he had failed to
4  show he was a person of good moral character. (Ex. 17.)

5        In March 2015, immigration officials served Castro with a notice to appear in
6  removal proceedings. (Ex. 22 at 62.) The notice alleged that Castro was removable for
7  having been convicted of a crime of moral turpitude, namely, shoplifting. (*Id.* at 63.) Castro
8  was represented in his removal case by immigration attorney Margo Cowan. (*See id.* at 48.)
9  The case was dismissed in August 2015 after the relevant shoplifting convictions were
10 vacated. (*Id.* at 66, 70, 80.)

11       In June 2022, Castro filed his second application for naturalization, this time with
12 Cowan's help. (Ex. 19.) Cowan signed the application, certifying that she had filled it out
13 on Castro's behalf and that Castro had confirmed the accuracy of the information within it.
14 (*Id.* at 28.) As relevant here, Cowan checked the "No" box in response to Question 30(C).
15 (*Id.* at 24.) In May 2023, Castro appeared for an interview with ISO Livia Lopez. (Ex. 21.)
16 The Electronic Immigration System (ELIS) record of the interview reflects that Cowan was
17 not present. (Ex. 20 at 40.) It further reflects that Castro amended several of the answers in
18 his application. (*Id.* at 42–43.) Among other things, he changed his response to Question 25
19 ("Have you EVER been convicted of a crime or offense?") from "No" to "Yes." (*Id.* at 42.)
20 In a written sworn statement, he added that he had been placed in removal proceedings in
21 2015 "due to some convictions allegedly occurring before 2009," but that he was released
22 after the convictions "were all voided in the interest of Justice." (Ex. 21 at 46.) The record
23 does not reflect that Castro amended his answer to Question 30(C).

24       Castro's application would not be denied until August 2025. (Ex. 48.) Meanwhile,
25 in February 2025, the USCIS Fraud Detection and National Security Directorate (FDNS)
26 referred Castro to Homeland Security Investigations (HSI) for investigation. (Ex. 57.) That
27 investigation resulted in Castro being indicted in May 2025 for knowingly making a false
28 certification as to Question 30(C) of his second application for naturalization. (Doc. 1.)

1    After this case was filed, Castro's counsel learned that there are no recordings of the October 2014 and May 2023 interviews. Counsel thus filed the currently pending motion to dismiss, asserting that the Government's failure to preserve such evidence constitutes a due process violation warranting relief. (Doc. 35.) The motion has been fully briefed. (Docs. 56, 58, 69, 83.) At a two-day evidentiary hearing, Castro offered numerous exhibits and presented the testimony of several witnesses. (Docs. 74, 84, 85, 86.) Among the witnesses were HSI Special Agent Randall Dillman, who participated in the investigation leading to the indictment; ISO Lopez, who conducted and recorded the interview of Castro in May 2023; and Field Office Director Julie Hashimoto, who oversees operations at the office where ISO Lopez works. (Doc. 85.) At the conclusion of the testimony, the Court heard oral argument and then took this matter under advisement. (Doc. 84.)

## Discussion

Castro claims that the Government violated due process in failing to preserve recordings of his October 2014 and May 2023 naturalization interviews. For a remedy, he requests dismissal of the indictment, or at least the reading of a remedial jury instruction at trial or entry of a remedial discovery order. Castro, however, is not entitled to relief.

**I.    Castro is not entitled to dismissal of the indictment.**

The test for determining whether the Government violated due process "depends on whether the [lost] evidence was material exculpatory evidence or simply potentially useful evidence." *United States v. Del Toro-Barboza*, 673 F.3d 1136, 1149 (9th Cir. 2012) (citing *Illinois v. Fisher*, 540 U.S. 544, 549 (2004) (per curiam)). If the evidence was materially exculpatory—i.e., it had "an exculpatory value that was apparent before [it] was destroyed" and was "of such a nature that the defendant [is] unable to obtain comparable evidence by other reasonably available means"—due process is violated regardless of whether the Government acted in bad faith. *California v. Trombetta*, 467 U.S. 479, 489 (1984); *Arizona v. Youngblood*, 488 U.S. 51, 57 (1988). If the evidence was only potentially useful, due process is not violated unless the defendant can show that the Government acted in bad faith. *Youngblood*, 488 U.S. at 58.

1    To begin, although Castro alleges in his motion that the Government violated due
2    process by not preserving a recording of the October 2014 interview, he made no attempt
3    to prove such a violation at his evidentiary hearing. There is no evidence that a recording
4    of the October 2014 interview ever existed, let alone evidence that any such recording was
5    materially exculpatory, potentially useful, or destroyed in bad faith. Indeed, at the close of
6    the testimony, Castro's counsel confined his arguments to the May 2023 interview. Given
7    the foregoing, the Court finds that there was no due process violation with respect to the
8    October 2014 interview.

9    Next, the Court finds that there was no due process violation with respect to the May
10   2023 interview. Beginning with the *Trombetta* test, Castro has failed to establish that the
11   interview recording had "exculpatory value that was apparent before [it] was destroyed."
12   467 U.S. at 489. Castro is charged with knowingly making a false certification as to
13   Question 30(C). (Doc. 1.) Should this case proceed to trial, Castro will argue that he relied
14   on Cowan's advice and thus did not *knowingly* make a false certification. (Doc. 91 at 122.)
15   Neither Castro's written sworn statement nor the ELIS record, both of which were made
16   during the interview, reference Cowan or Castro's answer to Question 30(C). (Exs. 20, 21.)
17   Aside from Castro, who did not testify, only ISO Lopez was present during the interview.
18   (Doc. 79 at 63–64.) ISO Lopez recalls very little about the interview beyond what is
19   documented in the sworn statement and ELIS record. She does not recall whether she
20   reviewed Castro's 2014 application before the interview. (*Id.* at 66.) She does not recall
21   whether Castro offered information about his criminal history verbally while filling out his
22   written statement. (*Id.* at 85.) And she does not recall whether there was any discussion
23   about Cowan. (*Id.* at 91, 98–99.)

24   There has been no showing that the recording was affirmatively exculpatory, or that
25   any exculpatory value was apparent before the recording was lost. Therefore, Castro has
26   not shown a due process violation under *Trombetta*. *See Youngblood*, 488 U.S. at 56 n.*
27   (stating that a mere "possibility" that lost evidence could have exculpated the defendant "is
28   not enough to satisfy the standard of constitutional materiality in *Trombetta*"). Castro's

- 4 -

1 counsel appeared to accept this conclusion during oral argument. (Doc. 91 at 129–30.)

2 Turning to the *Youngblood* test, Castro has shown that the recording was potentially useful. *Youngblood* explains that potentially useful evidence includes "material of which no more can be said than that it could have been subjected to tests, the results of which *might* have exonerated the defendant." 488 U.S. at 57 (emphasis added). This bar is not high. In *Fisher*, for instance, the police seized a white powdery substance from the defendant and tested it four times before destroying it. 540 U.S. at 545–46. Although all four tests confirmed that the substance was cocaine, the Supreme Court held that the substance "was plainly the sort of 'potentially useful evidence' referred to in *Youngblood*," since the defendant "could hope that, had the evidence been preserved, a *fifth* test conducted on the substance would have exonerated him." *Id.* at 545, 548.

While the recording of the May 2023 interview could not have been subjected to tests, it still might have been helpful to Castro's defense. Again, Castro intends to present an advice-of-counsel defense should this case proceed to trial. (Doc. 91 at 122.) There is support in the record for that defense. For instance, before applying, Castro asked Cowan's assistant whether "the thing in [his] past" would create "problems" with his application. (Ex. 38 at 370; Ex. 58 at 773.) In addition, Cowan filled out the application on Castro's behalf and signed it as the preparer. (Ex. 19 at 27–28.) Notably, during the interview, Castro changed some of Cowan's answer selections and provided information about his criminal history that had been omitted from the application. (Exs. 20, 21.) Considering Castro's concern about applying and revision of Cowan's work during the interview, the recording of the interview *might* have included discussion about the extent of Castro's reliance on Cowan.

Castro has failed, however, to show that the recording was destroyed in bad faith. "The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." *Youngblood*, 488 U.S. at 56 n.*. "[W]ithout knowledge of the potential usefulness of the evidence, the evidence could not have been destroyed in

bad faith." *United States v. Robertson*, 895 F.3d 1206, 1211 (9th Cir. 2018) (quoting *United States v. Zaragoza-Moreira*, 780 F.3d 971, 977 (9th Cir. 2015)).

As an initial matter, no one knows for certain when the recording was lost. ISO Lopez, who recorded the interview and saved it to her hard drive, testified that she did not purposely destroy the recording and that she does not know for certain when it might have been lost. (Doc. 91 at 11–13, 33, 45.) ISO Lopez explained that she experienced computer issues later in 2023 and into January 2024, and that her computer was cloned and replaced more than once during that period. (*Id.* at 26–28.) The Court credits this testimony. As there is no other direct evidence on this issue, the Court finds that the recording was more than likely lost no later than January 2024 as a result of those computer issues. Castro's counsel agreed that it is "reasonable" to conclude that the recording "was destroyed before the government decided to bring a criminal prosecution in this case." (*Id.* at 133, 143.)[2]

This finding all but ends the bad-faith inquiry. The HSI investigation that led to this prosecution did not begin until February 2025, when HSI received a referral about Castro from FDNS. (Ex. 57; Doc. 79 at 41.)[3] As noted, bad faith turns on the Government's "knowledge of the exculpatory value of the evidence *at the time it was lost or destroyed*." *Youngblood*, 488 U.S. at 56 n.* (emphasis added). ISO Lopez and her supervisors could not have known in January 2024 that the recording had exculpatory value as to Castro's charge—because the charge would not be investigated, and this criminal case would not be filed, until more than a year later. *See United States v. Little*, 308 F. App'x 256, 258–59 (10th Cir. 2009) (finding a lack of bad faith because the relevant authorities "lacked any knowledge that criminal proceedings were on the horizon" at the time the evidence was destroyed). Accordingly, Castro cannot show that the recording was destroyed in bad faith.

---

[2] Director Hashimoto explained that some ISOs receive an error message when their computer hard drives are too full to hold another interview recording, and that the ISOs must manually delete old recordings to make room for new ones. (Doc. 91 at 108–11.) She did not know whether ISO Lopez ever received that message, and ISO Lopez was not asked. (*Id.* at 110–11.) Again, though, the Court credits ISO Lopez's testimony that she did not purposely destroy the recording. If she did not delete it, then there must be some other explanation for its absence. Her computer issues provide that explanation.

[3] Before February 2025, Castro was under investigation only for conduct unrelated to this case. (Doc. 79 at 41.)

Castro's theory of bad faith is not persuasive. He argues that the caselaw requires only that the evidence have known exculpatory value, not that it have known exculpatory value as to the charge actually brought. (Doc. 91 at 133–34.) In other words, he believes that he can establish bad faith by showing that the lost recording had known exculpatory value as to *any* crime, including an uncharged, factually unrelated crime. (*Id.*) And here, he goes on, "there was a clear potential for a criminal . . . prosecution" for alien smuggling under 8 U.S.C. § 1324. (*Id.* at 134.) Finally, he asserts that bad faith is established because ISO Lopez and her supervisors had a duty under USCIS policy to make a DVD copy of the recording but failed to do so. (*Id.* at 132, 137, 143–44.)

The premise of Castro's argument—that he can establish bad faith by showing the recording had known exculpatory value as to an uncharged, unrelated crime when it was lost—is incorrect. Castro ignores that "exculpatory value" does not exist in the abstract; it exists only in relation to a defined criminal charge. In the context of this prosecution for false certification, information in the recording as to alien smuggling is not "exculpatory." Similarly, in the context of this case, the conduct of ISO Lopez and her supervisors cannot be described as anything more than negligent—and *Youngblood* is clear that negligence does not constitute bad faith. 488 U.S. at 58. In any event, the caselaw *does* make clear that the "exculpatory value" of evidence for purposes of bad faith must match the "potential usefulness" of the evidence. The Ninth Circuit Court of Appeals has observed repeatedly that "*Youngblood*'s bad faith requirement dovetails with the first part of the *Trombetta* test: that the exculpatory value of the evidence be apparent before its destruction," and that "*without knowledge of the potential usefulness of the evidence*, the evidence could not have been destroyed in bad faith." *Zaragoza-Moreira*, 780 F.3d at 977 (emphasis added) (citations omitted).

During oral argument, the Court asked whether Castro's counsel knew of "any cases that hold that the lost evidence standard would apply when there's just a mere potential for a prosecution and the evidence is destroyed." (Doc. 91 at 136.) In response, counsel pointed to *Zaragoza-Moreira*. (*Id.* at 136–37.) However, that case does not stand for the requested

1  proposition and is easily distinguishable. There, *after charges were filed*, the defendant's
2  attorney made a formal request to the Government to preserve video footage. *Zaragoza-*
3  *Moreira*, 780 F.3d at 976. An agent who participated in the investigation knew that she had
4  a professional obligation to preserve exculpatory evidence, that the defendant was claiming
5  duress, and that there was video that could substantiate the defendant's claim; yet the agent
6  allowed the video to be destroyed. *Id.* at 980. The court held that, given the agent's
7  knowledge, her "actions were not merely negligent or reckless" but rose to the level of bad
8  faith. *Id.* Here, in contrast, there was no hint of a prosecution for false certification at the
9  time the recording was destroyed.

10  Finally, Castro errs in placing significance on *Zaragoza-Moreira*'s language about
11  the agent having "a professional obligation to collect and preserve both exculpatory and
12  inculpatory evidence." (Doc. 91 at 136–37, 154.) That language does not mean that a mere
13  failure to meet professional standards constitutes bad faith. In that case, it was the agent's
14  failure to meet her obligations combined with her knowledge of the video's exculpatory
15  value that constituted bad faith. Here, ISO Lopez and her supervisors did not know the
16  interview recording had exculpatory value when it was lost. As a result, their failure to
17  make a copy of the recording does not constitute bad faith, even if such failure fell below
18  professional standards.

19  Castro is not entitled to relief under *Trombetta* or *Youngblood*. Therefore, the Court
20  will recommend that his motion to dismiss the indictment be denied.

21  **II.    Castro is not entitled to a remedial jury instruction.**

22  A jury instruction regarding lost evidence "is appropriate when the balance between
23  'the quality of the Government's conduct and the degree of prejudice to the accused'
24  weighs in favor of the defendant." *Robertson*, 895 F.3d at 1213 (quoting *United States v.*
25  *Loud Hawk*, 628 F.2d 1139, 1152 (9th Cir. 1979) (en banc) (Kennedy, J., concurring)). In
26  this analysis, "the government bears the burden of justifying its conduct and the accused
27  of demonstrating prejudice." *United States v. Sivilla*, 714 F.3d 1168, 1173 (9th Cir. 2013)
28  (citing *Loud Hawk*, 628 F.2d at 1152 (Kennedy, J., concurring)). Here, as an initial matter,

there is no evidence as to the creation or destruction of a recording of the October 2014 interview. So, there is no basis for granting a remedial jury instruction as to that interview. As to the May 2023 interview, as discussed below, the relevant factors do not support granting a remedial jury instruction.

In examining the Government's conduct, the following factors are relevant:

> whether the evidence was lost or destroyed while in its custody, whether the Government acted in disregard for the interests of the accused, whether it was negligent in failing to adhere to established and reasonable standards of care for police and prosecutorial functions, and, if the acts were deliberate, whether they were taken in good faith or with reasonable justification. . . . It is relevant also to inquire whether the government attorneys prosecuting the case have participated in the events leading to loss or destruction of the evidence, for prosecutorial action may bear upon existence of a motive to harm the accused.

*United States v. Wells*, 879 F.3d 900, 932 (9th Cir. 2018) (alteration in original) (quoting *Sivilla*, 714 F.3d at 1173).

Here, "the government's conduct may have been imperfect, but it was not unreasonable or in bad faith." *Robertson*, 895 F.3d at 1214. The recording was lost while in possession of USCIS, a federal agency, and the testimony indicates that a copy of it should have been made pursuant to USCIS policy. (Doc. 91 at 25, 73–74.) However, the loss is likely attributable to ISO Lopez's computer issues, which occurred long before there was even an investigation into Castro for false certification. This means that USCIS did not act deliberately or in disregard for Castro's interests. It also means that the prosecutors did not participate in the loss or fail to adhere to established prosecutorial standards. *Cf. Sivilla*, 714 F.3d at 1173 (holding that "the quality of the government's conduct was poor" where "[t]he prosecutor promised to protect the evidence but failed to take any affirmative action to that end"). So, at most, the loss was the result of negligent conduct untethered to the relevant criminal investigation.

In examining prejudice to the defendant, the following factors are relevant:

> the centrality of the evidence to the case and its importance in establishing the elements of the crime or the motive or intent of the defendant; the probative value and reliability of the secondary or substitute evidence; the

>nature and probable weight of factual inferences or other demonstrations and kinds of proof allegedly lost to the accused; the probable effect on the jury from absence of the evidence, including dangers of unfounded speculation and bias that might result to the defendant if adequate presentation of the case requires explanation about the missing evidence.

*Wells*, 879 F.3d at 932 (quoting *Sivilla*, 714 F.3d at 1173–74).

The Government has argued repeatedly that the recording is irrelevant because the crime was complete at the moment Castro filed the application (around a year before the interview). (Doc. 91 at 144–45.) Thus, the recording is not central to the Government's case. *See Robertson*, 895 F.3d at 1214 (finding minimal prejudice from the loss of a video in part because its content was not important to the Government's case). While the Court agrees with Castro that evidence postdating the filing of his application could bear on his mental state at the time of filing, he has not presented evidence showing that the recording does so. As explained earlier, neither the documentary evidence nor the testimony shows that the recording contained information helpful to Castro's defense. The exculpatory value of the recording is speculative and at most *potentially* useful. This indicates a lack of prejudice. *See id.* (finding minimal prejudice from the loss of a video because it was "not clear" that the video would have shown anything helpful to the defense); *United States v. Rosales-Aguilar*, 818 F.3d 965, 972 (9th Cir. 2016) (finding a lack of prejudice from the loss of a video where there was "no indication that there was anything on the video that in any way would be helpful" to the defendant (internal quotation marks omitted)). The value of the recording is even more speculative in light of Director Hashimoto's testimony that some recordings do not capture any audio. (Doc. 91 at 69, 105–06.)

The Government's conduct was unintentional and not in bad faith, and Castro's assertion of prejudice is speculative. Therefore, the Court will recommend that Castro's motion for a remedial jury instruction be denied.

### III. Castro is not entitled to a remedial discovery order.

The Government must, on the defendant's request, disclose any item that is "within [its] possession, custody, or control and . . . material to preparing the defense." Fed. R. Crim. P. 16(a)(1)(E)(i). If the Government fails to comply, the Court may "enter any . . .

order that is just under the circumstances." Fed. R. Crim. P. 16(d)(2)(D).

Castro is not entitled to a remedial discovery order. The rule's plain language limits the Government's disclosure obligations to items within its possession at the time of the defendant's request. Here, Castro requested preservation and disclosure of video evidence in June 2025. (Doc. 35-5.) The Court has found that the May 2023 interview recording was more than likely lost no later than January 2024. And if there ever was a recording of the October 2014 interview, it is safe to assume that it was lost long before then. As the Government was not in possession of the recordings at the time of Castro's request, there is no violation of Rule 16. Therefore, the Court will recommend that Castro's motion for a remedial discovery order be denied.

### Conclusion

The Court recommends that Castro's motion to dismiss the indictment or, in the alternative, motion for a remedial jury instruction or remedial discovery order (Doc. 35), be **denied**.

This recommendation is not immediately appealable to the United States Court of Appeals for the Ninth Circuit. The parties have 14 days to file specific written objections with the district court. Fed. R. Crim. P. 59(b)(2). The parties have 14 days to respond to objections. The parties may not file replies on objections absent the district court's permission. A failure to file timely objections may result in the waiver of de novo review. *United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc).

Dated this 12th day of February, 2026.

_____
Honorable Maria S. Aguilera
United States Magistrate Judge