**GREEN EVANS-SCHROEDER, PLLC**
Matthew H. Green (Bar No. 020827)
Peter Hormel (Bar No. 015808)
130 West Cushing Street
Tel.: (520) 882-8852
Fax: (520) 882-8843
Email: matt@arizonaimmigration.net
*Attorneys for Defendant*

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>            Plaintiff,<br><br>vs.<br><br>Hernan Rafael Castro,<br><br>            Defendant. | CR25-02525-RCC-MSA-1<br><br>**OBJECTIONS TO REPORT AND RECOMMENDATION**<br><br><br>(Honorable Raner C. Collins) |

The defendant, ("Defendant" or "Mr. Castro"), through counsel undersigned, hereby objects to the Report and Recommendation issued by the Magistrate Judge in this case on February 12, 2026 (Doc. 96).

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.    Introduction**

On August 29, 2025, Defendant filed his Motion to Dismiss Indictment (Doc. 35) based on the government's destruction of a recording of Defendant's interview at the

1

USCIS Tucson Field Office on May 17, 2023. In the alternative, Defendant requested that the court give a remedial adverse inference instruction to the jury.

Following the completion of briefing, an evidentiary hearing was held over two dates: November 18, 2025 and January 20, 2026. After the testimony was taken, the Magistrate issued a Report and recommended that the District Court deny the Defense motion *in toto*. For the purposes of this pleading, the requested jury instruction will be addressed first, and the motion to dismiss second.

**II.  Background**

Mr. Castro incorporates by reference the facts as set forth in his Motion to Dismiss Indictment (Doc. 35), the Governments' response (Doc. 56), Defendant's reply (Doc. 58), Defendant's Pre-Hearing Memorandum (Doc. 69), Defendant's Supplemental Pre-Hearing Memorandum (Doc. 83), and the Magistrate's Report and Recommendation (Doc. 96).  Mr. Castro likewise incorporates by reference the legal arguments he sets forth in Documents 35, 58, 69, and 83.

**III.  Discussion**

    **A. Legal Standard**

"A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C). *See*, e.g., *United States v. Ramos*, 65 F.4th 427, 433 (9th Cir. 2023).

    **B. The Magistrate Erred by Denying the Requested Remedial Instruction.**

As cited in the Report and Recommendation, the relevant factors for determining whether a remedial instruction should be given include the following:

1. Whether the evidence was lost or destroyed while in its custody;

2. Whether the Government acted in disregard for the interests of the accused,

3. Whether it was negligent in failing to adhere to established and reasonable standards of care for police and prosecutorial functions, and,

4. If the acts were deliberate, whether they were taken in good faith or with reasonable justification.

*United States v. Wells*, 879 F.3d 900, 932 (9th Cir. 2018) (alteration in original) (quoting *United States v. Sivilla*, 714 F.3d 1168, 1173 (9th Cir. 2013)). The factors listed here have their origin in *United States v. Loud Hawk*, 628 F.2d 1139 (9th Cir. 1979), which described them as "a wide number of factors including, without limitation…" *Loud Hawk,* at 1152. As such, this is a balancing test, not a definitive test which requires the strict fulfilment of each factor. Even without misreading the evidence to only find two of the four factors, the Magistrate Court should have found that the balancing test was met, an d should have ordered the remedial jury instruction as an appropriate, alternative remedy. Making it even clearer, the evidence shows that three of the four listed factors in *U.S. v. Wells* were in fact met, as described below.

### 1. The Government Disregarded Mr. Castro's Interests by Facilitating the Destruction of the Recording.

The Magistrate found that the first and third factors were met[1]. *See* Doc. 96, p. 9. However, regarding the second factor, the Magistrate concluded as follows:

> However, the loss is likely attributable to ISO Lopez's computer issues, which occurred long before there was even an investigation into Castro for false certification. This means that USCIS did not act deliberately or in disregard for Castro's interests. It also means that the prosecutors did not participate in the loss or fail to adhere to established prosecutorial standards.

This, however, is not what the evidence taken at the evidentiary hearing[2] shows. Relevant to this inquiry is Exhibit 27 ("USCIS Interview Recording using Webcams"), which was admitted into evidence. This document instructs the interviewing officer how to download recorded interviews onto an external DVD. USCIS Field Office Director Julie Hashimoto testified that there were 4 criteria that determine *when* an ISO is to download an interview onto a DVD: 1) in response to a FOIA, 2) when an interview involved a contentious interaction, 3) when there's a referral to the Fraud Detection National Security Directorate (FDNS), and 4) at the request of a congressional representative. *See* Document 91, Transcript of January 20, 2026 Evidentiary Hearing ("JEH"), p. 69, ll. 3-25. Ms. Hashimoto further testified that, in this case, the interview should have been downloaded:

> Q. Now, in last summer when you did your interview with Special Agent Dillman, you told him that under the circumstances this -- the recording should have been downloaded and saved, correct?
> A. Yes, under normal, uh-huh, procedures, it should be --
> Q. Okay.
> A. -- the way it's outlined.

---

[1] No evidence has emerged that the government intentionally destroyed the recording.
[2] The E.H. was conducted over two sessions, on November, 18, 2025 and January 20, 2026. The transcript from November will be referred to as "NEH".

4

> Q. So I just, I want to be clear.
> A. Yes.
> Q. That's what you've said?
> A. Yes.

JEH, p. 73, ll. 14-24.

Further, Ms. Hashimoto testified that because recorded interviews take up a lot of disk space on an ISO's hard drive, from time to time, the ISO will be prompted to purge their computer of older interviews before it can record new ones:

> Q. Okay. So if after 10 days there was no action taken on this case, what would have happened to that recording?
> A. It would have automatically, at some point, been deleted.
> Q. Okay. And that's just the system, the system automatically does that?
> A. The system alerts you with an error message when you're getting ready to do your interviews that there isn't enough space to record any interviews, that you must delete a certain amount of megabytes. Some in the office do it routinely on a reminder. I'm not sure how Officer Lopez controls her hard drive storage.

JEH, pp. 108-109, ll. 17-2.

Therefore, the loss of the recorded interview was not, as the magistrate concluded, "attributable to ISO Lopez's computer issues," but rather due to ISO Lopez' failure to download the interview onto an external DVD in accordance with the written policies and procedures governing such interviews[3].

ISO Lopez was well aware that Mr. Castro's case was out of the ordinary and that it involved complex issues, which would require downloading of the recording:

> THE COURT: Okay. Now, you indicated that the reason you did not approve the application initially was because there was a problem; is that right?

---

[3] It should be noted that the destroyed recording in *United States v. Zaragoza-Moreira,* 780 F.3d 971, 977 (9th Cir. 2015) (resulting in dismissal) was also recorded over as a matter of course, resulting in the loss of evidence.

5

>THE WITNESS: There was some issues that interview because the criminal history.

JEH, p. 45, ll. 20-24.

Further:

>Q. And then at some point shortly thereafter FDNS officer Pete Gray communicated with you about this case; is that correct?
>A. Yes, that is correct.
>Q. How long after May 17th, 2023, did Pete Gray communicate with you about Mr. Castro's case?
>A. I don't remember, probably a couple of weeks. I don't remember.

JEH, p. 22, ll. 15-21.

ISO Lopez furthermore acknowledged that the reason for this was that there was "derogatory information" about Mr. Castro and that a hold was being put on the file. JEH, p. 23, ll. 9-12. ISO Lopez discussed this case with FDNS Officer Pete Gray as well as with her supervisor, Duane Morrison. JEH, p. 29, ll. 15-25.

Lastly, ISO Lopez also discussed the matter with ISO-3[4] Carla Gonzalez:

>Q. What did you do to reach out to Carla Gonzalez after your meeting with Duane Morrison?
>A. In person to her to her office.

JEG, p. 21, ll. 11-13.

An ISO-3 is a highly trained and very experienced officer at USCIS. It is the ISO-3's job to make sure a new ISO is aware of departmental policy, including that regarding the downloading of interview recordings.

---

[4] For a description of the training and supervisory role and duties of an ISO-3 at USCIS, please see the testimony of Field Office Director Hashimoto at JEH, pp. 65-69.

6

In sum, therefore, the testimony shows that the interviewing officer, ISO Lopez, her supervisor Duane Morrison, ISO-3 Carla Gonzalez, *and* FDNS Officer Pete Gray were all aware that Mr. Castro's legal interests—both his interest in obtaining a naturalization as well as his criminal interests relating to a potential case[5] for immigration fraud—were very much in play. They all ignored the department's written policy to download the recorded interview—the acknowledged purpose of which is, in the first place, to protect the legal interests of the interviewee—to an external DVD before the computer required it to be purged to make room for subsequent interviews. This demonstrates a clear disregard for Mr. Castro's interests. The fact that ISO Lopez' computer at some later time had to be replaced is irrelevant.

Given that "the Court agrees with Castro that evidence postdating the filing of his application could bear on his mental state at the time of filing[6]," the balancing test cited in the Report and Recommendation[7] should tip in favor of Mr. Castro. In applying that balancing test, the Magistrate Court erred by finding only two of four factors met when actually there were three, as described above. As such, the evidence clearly supports the conclusion that the balancing test promulgated in *Loud Hawk* has been met.

---

[5] It would appear that the existence of this case *ipso facto* bears out why the regulations governing the recording of interviews exist and why they should be followed.
[6] Report and Recommendation, Document 96, p. 10.
[7] *See*, e.g. *United States v. Loud Hawk*, 628 F.2d 1139, 1152 (9th Cir. 1979), overruled on other grounds in *United States v. Loud Hawk,* 474 U.S. 302, 106 S. Ct. 648, 88 L. Ed. 2d 640 (1986), *United States v. Sivilla*, 714 F.3d 1168, 1173 (9th Cir. 2013) and *Robertson*, supra.

Further, in finding that the requisite prejudice to Mr. Castro was lacking, the Magistrate Court also concluded that the loss was "untethered to the relevant criminal investigation."[8] However, the evidence shows this was not the case. As cited above, FDNS Officer Pete Gray was involved in the case within a couple of weeks of the interview in 2023. USCIS Field Office Director Hashimoto described FDNS' role as follows:

> They're actually a liaison of communication between law enforcement and the adjudications. So they're basically the middle, the middleman in communications of what's going on. So typically if any enforcement components are looking into a case, FDNS would be the one who'd request it from us.

JEH, p. 88, ll. 4-9.

Once FDNS had placed a hold on the file and had become directly involved, this matter, far from being "untethered" from a criminal investigation, was now in the direct pipeline to such an investigation.[9] At this point, the jeopardy to Mr. Castro was obvious, and the preservation of evidence relating to his application was critical. The nature of this jeopardy is also directly distinguishable from the case cited by the Magistrate Court, *Little*, infra. In *Little*, the state agencies involved were concerned only with the remediation of asbestos and had no responsibility for—or role in—state or federal criminal prosecutions. USCIS ISOs and FDNS officers are different animals altogether, with specifically defined

---

[8] Report and Recommendation, Document 96, p. 9.
[9] *See* Defendant's Pre-Hearing Memorandum, Document 69, citing to the USCIS website, which explains that, among FDNS' essential functions, it exists to "[d]etect, deter, and administratively investigate immigration-related fraud," and to "[s]erve as USCIS' primary conduit for information sharing and collaboration with law enforcement and the Intelligence Community." Doc. 69, p. 10.

investigative functions and direct lines of communication with federal agencies responsible for the initiation of criminal prosecutions.

Lastly, the potentially exculpatory nature of the recording is hardly speculative. During the interview, Mr. Castro was cooperative in correcting other mistakes in his application. The "Government has argued repeatedly that the recording is irrelevant because the crime was complete at the moment Castro filed the application (around a year before the interview)[10]." However, the development of this case belies this line of argument. Mr. Castro's application contains other factual inaccuracies[11]. For example, on question 35 of his written application, which asks whether he was ever placed in removal proceedings, the box was checked "No." *See* admitted Exhibit 19, N-400 Application, p. 15. ISO Lopez was aware on the date of the interview that the government had previously attempted to remove Mr. Castro:

> Q. Let -- let's just talk about a couple of the – the other -- the other questions. You -- so you were aware -- you were aware on May 17, 2023, that Mr. Castro had been in removal proceedings previously, correct?
> A. Yeah.

NEH, p. 93, ll. 2-7.

While the documents do not show that she prompted Mr. Castro to correct this error, Mr. Castro did, in the sworn statement he executed during the interview, volunteer corrective information. The May 17, 2023 sworn statement, administered to Mr. Castro while he was being interrogated about his criminal history by ISO Lopez, was admitted

---

[10] Report and Recommendation, Document 96, p. 10.
[11] For example, question 36 asking about pending removal matters was left blank.

9

into evidence as Exhibit 21, in which he wrote in response to the catch-all question "Is there something else that you want to add":

> In March 2015 I was detained by Immigration due to some convictions allegedly occurring before 2009. These claims were proved to be in violation of my rights as a non citizen; therefore they were all voided in the interest of justice. The immigration claims were also voided and I was released by Immigration. My status was restored as permanent resident.

Exhibit 21, p.2

The government has not charged Mr. Castro for falsely certifying that he had never been in removal proceedings. If the government's argument is to be believed, then Mr. Castro committed a crime when he checked "no" in the box for question 35, and the crime was complete the moment he handed in his application. And yet, as the Magistrate Judge recognized, what occurred at the May 17, 2023 interview is probative of Mr. Castro's state of mind (i.e., *mens rea*) when he signed the application in June, 2022. Therefore, while it is unsurprising that the government chose not to charge him with another count for answering question 35 incorrectly, the functional difference between the *uncharged* incorrect answer and the *charged* incorrect answer is what occurred during the interview.

And given that Mr. Castro directly referenced "some convictions allegedly occurring before 2009" in his sworn statement, it is highly likely that the interview itself contains some reference to the substance of the indictment.

### 2. The Recording Would Have Shown that Mr. Castro was Acting On the Advice Of Counsel.

It is the defense position that the above is already sufficient to support the giving of a remedial instruction. However, there is an additional factor that further supports it, as well as providing support for dismissal as outlined below in Section C.

Mr. Castro was represented by counsel throughout the underlying proceedings. Attorney Margo Cowan, in her role as leader of the Tucson immigration non-profit Keep Tucson Together (KTT) represented Mr. Castro during his removal proceedings in 2015, in his effort to have his green card reinstated in 2016, as well as during his N-400 naturalization proceedings in 2022-2023. KTT drafted Mr. Castro's N-400 application and Ms. Cowan signed it as the preparer. KTT maintained a client file for Mr. Castro, which was admitted into evidence as Exhibit 38 during the evidentiary hearing. The file contains the following exchange of text messages between Mr. Castro and staff at KTT[12]:

Oh ok and what did Margo say about my case
[Redacted] May 4, 2022

> SHE TOLD ME YOU SHOULD APPLY FOR CITIZENSHIP
> May 4, 2022

And I won't have any problems with the thing in the past?
[Redacted] May 4, 2022

> SHE TOLD ME YOU COULD APPLY

[Redacted]

> May 4, 2022
> SHE TOLD ME YOU COULD APPLY
> WHEN SHE TELLS ME TO DO THIS, IT IS BECAUSE SHE THINKS YOU
> WON'T HAVE ANY PROBLEMS
> May 4, 2022

---

[12] *See admitted* Exhibit 58.

11

This, combined with the language of Mr. Castro's sworn statement answer (quoted in full above from Exhibit 21), shows that Mr. Castro was relying on the advice of his counsel in formulating answers to questions relating to his past. Therefore, given that the interview and the sworn statement directly reference information that was the subject of Mr. Castro's concerned communications with his lawyer, it is highly probable that the recording contained reference to his reliance on counsel.[13]

This is far from speculative. The video recording evidence would have gone to the heart of the government's theory of guilt, i.e., that Mr. Castro signed his N-400 application *knowing* that it contained legally incorrect information.[14] As such, the destroyed evidence also goes to the heart of the defendant's theory of innocence, i.e., reliance on advice of counsel/failure to prove the defendant acted knowingly. Therefore, pursuant to the standards set forth in the caselaw cited by the Magistrate Court, Mr. Castro is entitled to have the jury instructed to take an adverse inference from the government's destruction of evidence.

**C. The Magistrate Erred by Denying the Motion to Dismiss.**

---

[13] During closing argument, undersigned counsel addressed Mr. Castro's written answer on his May 17, 2023 sworn statement (Exh. 21), and explained: "This answer just smacks of legal advice. He's talking about vacating his convictions for due process rights. This is not the way a normal person talks unless they've heard it from their lawyer." JEH Transcript, p. 128, lns. 19-22.

[14] It bears repeating that the jury will acquit Mr. Castro if, based on the evidence, they conclude that there is reasonable doubt as to whether his decision to sign the application was based on "ignorance, mistake, or accident," and in reaching that decision, the jury "may consider evidence of the defendant's words, acts, or omissions, ***along with all the other evidence***, in deciding whether the defendant acted knowingly." Ninth Circuit Pattern Criminal Jury Instruction, 4.8. (Emphasis added.)

Mr. Castro incorporates the examination of the record set forth in Section B above herein. As cited in the Report and Recommendation, if the destroyed evidence was materially exculpatory—i.e., it had "an exculpatory value that was apparent before [it] was destroyed" and was "of such a nature that the defendant [is] unable to obtain comparable evidence by other reasonably available means"—due process is violated regardless of whether the Government acted in bad faith. *California v. Trombetta*, 467 U.S. 479, 489 (1984); *Arizona v. Youngblood*, 488 U.S. 51, 57 (1988). If the evidence was only potentially useful, due process is not violated unless the defendant can show that the Government acted in bad faith. *Youngblood*, 488 U.S. at 58. *See*, Report and Recommendation, Document 96, p. 3.

It is Mr. Castro's position that the exculpatory nature of the evidence was obvious to the government almost immediately; that is, not only ISO Lopez and FDNS Officer Gray, but the collective manpower at the USCIS Field Office that was aware that (a) derogatory information (b) prompted ISO Lopez to issue a sworn statement (c) and that under the internal 4-factor policy, the recording was required to be downloaded. This includes ISO Lopez, Supervisor Morrison, ISO-3 Gonzalez and FDNS Officer Gray[15].

As stated above, ISO Lopez had Mr. Castro execute a sworn statement during his interview. This process would have been preserved on the recording that was destroyed.

---

[15] Field Office Director Hashimoto's testimony was clear that she expects her officers to be aware of the criteria (the "4-part test") requiring downloading and preserving of recorded interviews. Specifically: JEH, p. 67, ll. 15-18. Generally, JEH, pp. 63-70.

The USCIS policy manual[16], admitted as Exhibit 54, states as follows regarding sworn statements:

> The sworn statement becomes part of the permanent, official record and **_may be used in a subsequent proceeding or prosecution._** The determination of benefit eligibility may depend on the evidence in the sworn statement and the interview record it creates may be particularly important in complex cases, such as those involving national security or fraud concerns. (Emphasis added.)

Alternatively, if the Court should find that the evidence was only potentially useful pursuant to *Youngblood*, then bad faith is evident:

- The threats to Mr. Castro's administrative and criminal interests were obvious from the start, as described above, and ISO Lopez, FDNS Officer Pete Gray, ISO-3 Carla Gonzalez, and Supervisor Duane Morrison were all aware of this;

- These Officers all knew that the interviews were recorded in order to protect the legal interests of the interviewee;

- USCIS policies and procedures provided specific instructions regarding the preservation of such interviews;

- Field Office Director Hashimoto acknowledged that the recording should have been preserved;

- The government nevertheless violated its own policies and procedures in facilitating the destruction of the evidence.

---

[16] Field Office Director Hashimoto's testimony was also clear that, along with "the handbook," the USCIS Policy Manual "is the primary procedures manual for immigration services officers," and that she would expect her officers to follow the applicable procedures as laid out in the policy manual before, during, and at the conclusion of a naturalization interview. JEH Transcript, pp. 55-56.

Although the Report and Recommendation sought to distinguish this case from *United States v. Zaragoza-Moreira*, 780 F.3d 971 (9th Cir. 2015),[17] the points cited by the Magistrate line up with the facts in *Zaragoza-Moreira*, except for the final conclusion:

- The agent in the investigation knew she had a professional obligation to preserve the evidence;
- That the interviewee was denying wrongdoing and claiming to be acting on the advice of counsel;
- That the recording would reflect this.

The Report and Recommendation relies on the following interpretation to distinguish the cases: "Here, in contrast, there was no hint of a prosecution for false certification at the time the recording was destroyed." In support of this conclusion, the Magistrate Court cited *United States v. Little*, 308 F. App'x 256, 258–59 (10th Cir. 2009)[18] for the proposition that there is no bad faith if the relevant authorities "lacked any knowledge that criminal proceedings were on the horizon" at the time the evidence was destroyed. As described in detail above, this was simply not the situation in Mr. Castro's case. ISO Lopez

---

[17] Report and Recommendation, p. 8: "An agent who participated in the investigation knew that she had a professional obligation to preserve exculpatory evidence, that the defendant was claiming duress, and that there was video that could substantiate the defendant's claim; yet the agent allowed the video to be destroyed. Id. at 980. The court held that, given the agent's knowledge, her "actions were not merely negligent or reckless" but rose to the level of bad faith. Id. Here, in contrast, there was no hint of a prosecution for false certification at the time the recording was destroyed."

[18] It should be noted that the *Little* court relied on dicta from *State v. Pearl*, 324 F.3d 1210 (10th Cir. 2003), which turned on destroyed evidence that was available to the defendant via other means, making *Trombetta* inapplicable.

was aware that FDNS had taken over Mr. Castro's file and was aware that Mr. Castro's interests were in direct jeopardy. Furthermore, FDNS and other supervisory personnel at USCIS were also aware of what was at stake.

*Little* is distinguishable for other reasons as well. *Little* involved the prosecution of an individual who ran a crew of municipal employees and state prison inmates in an Oklahoma state building renovation project. That project involved the removal of insulation that turned out to contain asbestos. During the removal, officials from the Oklahoma Department of Labor sent samples of the insulation to a private laboratory "as part of that department's regulatory investigation into whether state law required a licensed contractor to remove the insulation." *Little,* at 258.[19] The asbestos samples were destroyed after sampling pursuant to laboratory policy. The differences between *Little* and this case could not be clearer. The testing in that case was undertaken at the behest of state agencies with the specific purpose of determining how to deal with the insulation in the first instance, and there was no involvement from an investigative agency with a specific mandate to provide information to law enforcement. The federal authorities that charged Mr. Little did not get involved until later. In Mr. Castro's case, FDNS was involved almost immediately, placing a prosecution squarely in view, not just "on the horizon." Lastly, the material in *Little* was a dangerous carcinogen, whose destruction was a matter of public

---

[19] Apparently, the local municipality, Elk City, then hired the Oklahoma Department of Central Services to remove the material. That department also sent samples to the lab.

safety. A digital recording presents no such danger, and directly opposite to what occurred in *Little*, relevant policy mandated the *preservation* of the evidence, not its destruction.

**IV.     Conclusion**

For the foregoing reasons, it is requested that the District Court make a de novo determination of the Magistrate's recommendation and order that this case be dismissed with prejudice.

Alternatively, it is requested that the Court instruct the jury to draw an inference adverse to the government relating to the contents of the destroyed recording.

As a third alternative, it is requested that the District Court hold in abeyance any final ruling on the requested jury instruction until evidence has been taken at trial.

RESPECTFULLY SUBMITTED this 25th day of February, 2026.

By: s/ *Matthew Green*
Matthew Green
Attorney for Defendant

Copy of the foregoing
via Email to:

Jose R. Solis, Esq.
Assistant United States Attorney

Jane Westby, Esq.
Assistant United States Attorney